1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

DANISHA SCOTT,

        Plaintiff

    v.

MICHAEL J ASTRUE

        Defendant.

Case No. 12-1835 LB

**ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT, AND REMANDING FOR FURTHER CONSIDERATION**

**[Re ECF Nos. 17, 21]**

## INTRODUCTION

Plaintiff Danisha Scott moves for summary judgment, seeking judicial review of a final decision by defendant Michael Astrue, the Commissioner of Social Security Administration (the "Commissioner"), denying her Social Security Income ("SSI") disability benefits for her claimed disability of hernias, heart murmur, and asthma.  Pl.'s Mot., ECF No. 17[1]; AR 1, 103, 105.  The Administrative Law Judge ("ALJ") determined that Ms. Scott had no past relevant work but was capable of performing other jobs such as hand packager/ inspector, laundry worker, and final assembler that all existed in significant numbers in the national economy.  AR 31.

---

[1]  Citations are to the Electronic Case File ("ECF") with pin cites to electronically-generated page numbers at the top of the document

CV 12-1835
ORDER

1    Pursuant to Civil Local Rule 16-5, the matter is deemed submitted for decision by this court

2    without oral argument.  All parties have consented to the court's jurisdiction.  ECF Nos. 12, 18.

3    For the reasons stated below, the court **GRANTS IN PART** Ms. Scott's motion for summary

4    judgment, **DENIES** the Commissioner's cross-motion for summary judgment, and **REMANDS**

5    this case to the Administrative Law Judge to conduct a proper inquiry into the opinions of Drs.

6    Rao and Eichelberger.

7                                           **STATEMENT**

8    **I. PROCEDURAL HISTORY**

9        Ms. Scott, now 29 years old, filed her application for supplemental security income under XVI

10   of the Social Security Act on January 22, 2009.  AR 103-104, 229-235.  The Commissioner denied

11   her application both initially and upon reconsideration.  AR 103,104-08, 109-113.  Ms. Scott

12   timely requested a hearing before an ALJ on May 19, 2009.  AR 104.  An ALJ conducted a

13   hearing on January 19 and May 10, 2011 in Oakland, California.  AR 36, 73.  At the January 19,

14   2011 hearing, Ms. Scott appeared with her attorney, Steven Weiss, and testified at the hearing

15   along with vocational expert Malcolm Bracynski and medical expert Walter Luwen ("ME").  AR

16   36.  During the hearing, the ME suggested that Ms. Scott undergo further psychological testing

17   due to the incompleteness of the record.  AR 22, 62.  On May 10, 2011, Ms. Scott returned with

18   her attorney, and testified along with the ME and the vocational expert Mary Ciddio ("VE").  AR

19   73.

20       The ALJ issued a decision on July 6, 2011 that found Ms. Scott was not disabled because she

21   was capable of performing other jobs such as a hand packager/ inspector, laundry worker, and

22   final assembler that all existed in significant numbers in the national economy.  AR 31.

23       Ms. Scott timely requested that the Appeals Council review the ALJ's decision.  AR 7.  The

24   Appeals Council denied the request for review on February 9, 2012.  AR 1-6.  That denial

25   rendered the ALJ's July 6, 3011 decision the Commissioner's final decision.  AR 1.

26       Ms. Scott commenced this action for judicial review pursuant to 42 U.S.C. § 405(g).  Compl.,

27   ECF No. 1.  Ms. Scott and the Commissioner both now move for summary judgment.  Pl.'s Mot.,

28   ECF No. 17; Comm'r's Opp'n and Cross-mot., ECF No. 21.

United States District Court
Northern District of California

## II. SUMMARY OF RECORD AND ADMINISTRATIVE FINDINGS

This section summarizes (A) the medical evidence in the administrative record, (B) the medical expert's testimony, (C) the vocational expert's testimony, (D) Ms. Scott's testimony, and (E) the ALJ's findings.

### A. Medical Evidence

#### 1. *Dr. Rao* on 10/21/09 (examining psychologist)

In October 2009, Dr. Rao diagnosed Ms. Scott with psychotic disorder, anxiety disorder, asthma, and umbilical hernia. AR 403. Dr. Rao reported that Ms. Scott "appeared to have symptoms suggestive of depression, psychosis and ongoing persecutory delusions." AR 403.

In her report, Dr. Rao indicated that Ms. Scott is able to conduct activities of daily living but is not capable of managing her funds. AR 401-403. In examining Ms. Scott, Dr. Rao noted that her intellectual functioning was average and her thought processes were goal-directed. AR 402. She was also alert and oriented. AR 402.

With respect to Ms. Scott's "history of presenting illness," Dr. Rao reported,

> She is a 26-year-old female with history of depression. She comes in with symptoms suggestive of depression and anxiety. She has poor concentration, breathing problems secondary to asthma which gets mixed with anxiety. She cannot breath. She gets blurry for 10 minutes. She feels overwhelmed easily, which results in inability to do any activities. She is highly self conscious. She has had panic attacks for the last two years. At time she believes that there are cameras in the ventilators and in the trash cans. She feels that they can read thoughts, broadcasting her thoughts. She denies any sucidality or homicidality.

AR 401.

With respect to functional assessment, Dr. Rao believed that Ms. Scott had the following impairments: 1) moderately impaired in her ability to understand, remember, and complete simple instruction; 2) severely impaired in her ability to understand, remember, and complete complex instruction; 3) severely impaired in her ability to interact appropriately with supervisors, coworkers, and the public; 4) and severe difficulties with usual stressors encountered in a competitive work environment. AR 403.

#### 2. *Dr. Cory A. Brown* on 11/19/09 (non-examining psychologist)

In a "Case Analysis," Dr. Cory Brown, a psychologist, suggested that another evaluation

United States District Court
Northern District of California

should be conducted because Dr. Rao's evaluation "is poorly done." AR 404.  He elaborated that "it is too brief and the report does not show that an adequate assessment was done." AR 404.  In addition, Dr. Brown pointed to the MSS as "not supported by the rest of the report, partially because there is not much to the rest of the report." AR 404.  In order to clearly determine Ms. Scott's ability to perform tasks, Dr. Brown advised that WAIS, WMS, Bender and Trails be administered.  AR 404.

### 3. **Dr. Frank Chen** on 03/11/09 (examining physician)

In March 2009, Dr. Frank Chen completed an "Internal Medicine Consultation Examination" report on Ms. Scott.  AR 349.  Dr. Chen reported that Ms. Scott's chief complaints were umbilical hernia and asthma.  Turning to Ms. Scott's history of her present illnesses, Dr. Chen noted that Ms. Scott developed an umbilical hernia while she was pregnant in April 2005.  As for her asthma, Ms. Scott symptoms started at 12.  Dr. Chen indicated that Ms. Scott's symptoms have subsided and became seasonal since 2005.  Moreover, Dr. Chen noted that Ms. Scott had no ER visits related to her asthma symptoms.  AR 349.

With respect to Ms. Scott's physical examination, Dr. Chen noted that Ms. Scott "walks without difficulty and sits comfortably during the exam." AR 349.  Ultimately, Dr. Chen noted the following diagnostic impression: 1) Ms. Scott has a reducible umbilical hernia; 2) she has a history of asthma that is presently asymptomatic; and 3) Ms. Scott is six months pregnant.  AR 349.

### 4. **Dr. Joan L. Bradus** on 03/27/09 (non-examining physician)

Dr. Bradus reviewed the medical reports of Ms. Scott and found that it "suggest[s] claimant can perform light range of work with limited exposure to chemicals, fumes, and smoke due to history of asthma." AR 357.  He further elaborated that Ms. Scott "reported dizziness but was found pregnant." AR 357.  Because "[p]regnancy does not last 12 mo[nth]s and, as the limitations recommended by CE are due to pregnancy," he concluded that "there is no severe impairment." AR 357.  With respect to Ms. Scott's credibility, Dr. Bradus found that Ms. Scott was "partially credible" and that the "objective findings are less severe than" her allegations.  AR 357.

1
2
3
4
5
6
7
8
9
10

United States District Court
Northern District of California

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

     5. **Dr. Norbeck** *on 12/15/09 (non-examining physician)*

    In December 2009, Dr. Norbeck prepared a "Psychiatric Review Technique" of Ms. Scott and concluded that Ms. Scott had no medically determinable impairment. AR 405.

     6. **Native American Health Center ("NAHC")** *(treating physician)*

    Ms. Scott was a patient at NAHC. At NAHC, the record shows that Ms. Scott's asthma is mild. AR 393.

    On January 21, 2010, Dr. Eichelberger reported that Ms. Scott was at the NAHC for antidepressants because she "feels sad, anxious, nervous, [and] angry." AR 432. He opined that Ms. Scott's "recent cousin's funeral made [her] feel like [she] needs to do something." AR 432. She also requested to see if "she can talk to a counselor." AR 432.

    On April 26, 2010, Dr. Eichelberger reported that Ms. Scott stated that she felt much better after taking Prozac. AR 433. In addition, he reported that Ms. Scott never contacted the referral provided to obtain counseling. AR 433. He explained that Ms. Scott stated that she "doesn't feel [that she] needs pills or counseling . . . ." AR 433.

     7. **Dr. Patricia Spivey** *on 02/25/11 (examining physician)*

    In February 2011, Dr. Patricia Spivey, a psychologist, prepared a "Psychological Disability Evaluation." AR 444. In preparing the evaluation, Dr. Spivey reviewed Ms. Scott's form SSA-3368. AR 444. In terms of psychiatric history, Dr. Spivey reported that Ms. Scott has a history of depression that started at age 12. She attempted suicide at age 12 and then again at age 15. AR 444.

    Dr. Spivey administered several tests: 1) Pre-test Interview; 2) Mental Status Exam; 3) Wechsler Memory Scales, Selected Subtests (WMS-IV); 4) Wechsler Adult Intelligence Adult Intelligence Scale (WAIS-IV); and 5) Bender-Gestalt-II. AR 445. With respect to the WAIS score, Ms. Scott had a full scale IQ of 75, which is the borderline range. AR 445. Moreover, Dr. Spivey reported that Ms. Scott's results indicated adequate reasoning skill and that she was within normal limits on the memory test. AR 445. In examining Ms. Scott, Dr. Spivey concluded that her diagnostic impressions were depressive disorder NOS and borderline intellectual functioning. AR 446.

1    With respect to work-related abilities, Dr. Spivey reported a mild impairment in the following

2 functions: 1) ability to maintain adequate pace or persistence to complete simple, repetitive tasks;

3 2) ability to maintain adequate pace or persistence to complete complex tasks; 3) ability to

4 maintain adequate attention or concentration; 4) ability to adapt to change in job routine; 5) ability

5 to withstand the stress of a routine work day; and 6) ability to interact appropriately with co-

6 workers, supervisors, and the public on a daily basis.  AR 446.  In addition to these mild

7 impairments, Dr. Spivey reported that Ms. Scott has a moderate impairment in the ability to

8 maintain emotional stability or predictability.  AR 446.  Otherwise, Dr. Spivey did not find any

9 other impairment.  AR 446.

10    With respect to present functioning, Dr. Spivey reported the following:

11        She denies current suicidal ideation, but chronic low mood.  She reports having
         relief from symptoms with medication and therapy.  Cognitively, she has borderline
12        intellectual functioning but no severe cognitive deficits.

13 Ultimately, Dr. Spivey concluded that Ms. Scott's prognosis is "[g]ood with continued

14 treatment."  AR 446.  Moreover, Dr. Spivery found that Ms. Scott does not need help with

15 handling funds.  AR 446.

16    *8.  Psychological Services Center (PSC) (treating psychologist?)*

17    In a letter dated May 12, 2011, Anna Bailey, a psychology trainee, reported that Ms. Scott was

18 seen on three occasions: January 12, April 13, and April 20 for a total of 100 minutes.  AR 451.

19 Timothy Tisdell, a clinical psychologist and supervisor, also signed the letter.  AR 451.  In that

20 letter, Ms. Bailey reported that Ms. Scott had "symptoms of anxiety as evidenced by her behavior

21 [i]n the therapy room including: psychomotor agitation, fleeting eye contact, and nervous

22 laughter."  AR 451.  Moreover, Ms. Bailey reasoned that Ms. Scott "also reported panic attacks

23 and the following psychotic symptoms: paranoia, auditory hallucinations, visual hallucinations,

24 and intrusive ideation."  AR 451.

25 **B.  Medical Expert's Testimony**

26    *1.  Testimony on 01/09*

27    First, Dr. Lewin addressed Dr. Rao's diagnosis that Ms. Scott has psychotic and anxiety

28 disorders.  AR 61.  He mentioned that "there's absolute no mention of psychological factors" on

CV 12-1835
ORDER                                6

the internal medicine CE.  AR 61.  With the 14 medical records, Dr. Lewin testified that "there is really is no evidence of – in the records, of psychiatric treatment, medication . . .based on testimony is different, and has – it has changed."  AR 62.  Moreover, the only outpatient medication, Zoloft and Tradzodone, prescribed was not prescribed by a psychologist.  AR 62. Due to the lack of inpatient or outpatient treatment, Dr. Lewin's impression of Ms. Scott's symptoms is that they were not severe.  AR 62.

Dr. Lewin testified that "in reading the records, there was question of that the testing wasn't as complete as it might be."  AR 62.  Moreover, the records are not exactly clear as to what Ms. Scott's symptoms are and how she experiences them.  AR 62.  Dr. Lewin found that "the record shows no evidence of any serious psychiatric impairment."  AR 62.  With Ms. Scott's testimony, Dr. Lewin suggested that she should have another psychological testing CE because the testimony raises "some doubt."  AR 62.  Dr. Lewin testified the evidence was insufficient to a support a finding of marked impairment.  AR 63.

### 2.  *Testimony on 05/09*

In light "of a conflict between Dr. Rao and Dr. Spivey," Ms. Scott's attorney asked Dr. Lewin what impairments Ms. Scott has.  AR 88.  Dr. Lewin summarized the reports.  AR 88.  In considering the new report, Dr. Lewin provided the following analysis:

> It was my impression that we're now considering the new report, that under 12.02, she has borderline intellectual functioning, and under 12.04, the depressive disorder NOS.  Under the criteria, I thought the activities of daily living were limited. Apparently, she is able to take care of her children, she's able to drive.  Under the social functioning, she did seem somewhat isolated.  I put moderate.  But again, in both her and her mother's report, they put in that she had no difficulty getting along with supervisors.  Maintaining concentration, persistence or pace, mild to moderate, and episodes of decompensation of extended duration, none.

With respect to a functional capacity assessment, Dr. Lewin found that Ms. Scott did not have any marked limitations but had moderate limitations in the following: 1) the ability to understand, remember, and carry out detailed instructions; 2) the ability to work in coordination without being distracted by them; 3) the ability to interact appropriately with the general public; and 4) the ability to set realistic goals.  AR 89.

United States District Court
Northern District of California

In generating this report, Dr. Lewin reviewed opinions from NAHC, PSC, and Drs. Rao, Warner, and Spivery.  With respect to the psychotic disorder diagnosis, Dr. Lewin stated, in relevant part:

> Then, then important one was of Dr. Dr. Rao, who gave symptoms, a history of depression, poor concentration, anxiety, unable to do duties, self-conscious, and that people can read and broadcast her thoughts.  On the signs, he noticed that she was—mood was depressed, the affect was anxious, and the fund of knowledge, poor.  He gave her the diagnosis of psychotic disorder, but I did not think there were any signs or—or yes, signs of a psychotic disorder.  And also, this whole record shows no evidence of being treated for a psychotic disorder, the whole file.

Dr. Lewin then turned to the letter from PSC.  AR 89.  Even though Ms. Scott had three treatment sessions with Ms. Bailey, Dr. Lewin found that "there were no signs that were recorded."  AR 89.  Moving to the NAHC record, Dr. Lewin summarized the reports, stating that "it was reported that she took Prozac, feels better, and the person who was seeing her said, 'No need for psychiatric consult.'"  AR 89.  On a separate occasion, the NAHC noted that she was a "little anxious lately" and diagnosed her with major depressive disorder.  AR 89.

> She did determine that Ms. Scott had a-was in special education and had a learning disorder, and that she went through the 11th grade.  She also had a history that she had auditory hallucinations occasionally, and that she was being treated with Zoloft.  She did not report any signs on the metal status examination.  Perhaps, ideas of reference, but that was kind of weak.  I thought in the testimony today it was, also.  She did find a borderline IQ of 75 and made the diagnosis of depressive disorder NOS and borderline intellectual functioning.

Summarizing his finding, Dr. Lewin stated that "Ms. Scott is a 23 year old woman reporting asthma, anxiety, and depression" and with a "psychiatric diagnosis of depressive disorder NOS."  AR 90.  He concluded that Ms. Scott's symptoms "did not meet or equal a listing, and she had no marked functional limitations."  AR 90.

When asked whether Ms. Scott would be too anxious to work around or directly with others, Dr. Lewin did not think so.  AR 91.  In listening to Ms. Scott's testimony and reviewing the medical records, Dr. Lewin did not find that Ms. Scott has anxiety of the degree that she alleges.  AR 92.

The ALJ then asked if a limitation on detailed and complex instructions and no work with the

CV 12-1835
ORDER                                                   8

United States District Court
Northern District of California

United States District Court
Northern District of California

1   public be appropriate.  AR 91.  Agreeing with the ALJ's limitation, Dr. Lewin stated that there are

2   no other limitations that he believes would be appropriate.  AR 91.

3   **C.  Vocational Expert's Testimony**

4        Mary Ciddio, the VE, found that Ms. Scott did not have any past relevant work.  The ALJ then

5   posed a hypothetical of an individual with Ms. Scott's age, education, and work background plus

6   the following limitations: 1) no complex or complicated instructions; and 2) no unstructured work

7   with public, minimal interaction with other co-workers.  AR 95.  The VE found that under such a

8   hypothetical an individual would be able to perform the following occupations: 1) a laundry

9   worker (DOT# 302.685-010) at SVP 2 and a light exertional level with 915,890 positions

10  nationally and 4,710 positions locally; 2) plastics inspector (DOT# 559.687-074) at SVP 2 and a

11  light exertional level with 472,900 positions nationally and 4,160 positions locally; and 3) final

12  assembler (DOT# 713.687-018), at SVP 2 and a sedentary exertional level.  AR 95.[2]

13  **D.  Ms. Scott's Testimony**

14       The ALJ first questioned Ms. Scott about her living situation and daily activities.  AR 77-78.

15  Ms. Scott answered that she lives with her mother and three children.  AR 41, 77.  In terms of

16  chores, Ms. Scott's mother "mainly do[es] everything" for her.  AR 47, 77.  For instance, Ms.

17  Scott's mother usually takes care of the shopping for her.  AR 47.  Ms. Scott testified, however,

18  that she can cook by herself if she "really wanted to" do so.  AR 49.  In addition, when her mother

19  is at work, Ms. Scott testified that she is able to care for her children by herself.  AR 49.

20       With respect to her anxiety, Ms. Scott discussed that attending the store alone makes her

21  anxious.  AR 47.  She described her anxiousness as follows:

22

23           I start to sweat.  I start to breath, like a lot – Like I can't – Like sometimes I feel
            like I need my asthma pump, and at certain times, I feel like – I pass out once.
24           Well, about twice or three times I passed out, but the first time was Like the worst
            time that I passed out, because it was like a complete blackout.  AR 47.
25

26

27  ───────────────
    [2]  The court omits here the limitations that Ms. Scott's attorney mentioned, because the
28  hypothetical is less of an issue in this case and the attorney's hypothetical did not add very much
    to the conversation.

The ALJ then asked if she had passed out this year.  Ms. Scott explained that she had felt as if she was going to pass out but she tried to calm herself down.  AR 47.  Ms. Scott testified that she is taking Zoloft and Trazodone to treat this condition.  AR 47.

Most of the time, she takes her children outside with her mother.  AR 78.  Ms. Scott testified that she believes that she can care for her children by herself and that she sometimes takes her children outside by herself.  AR 78.  Despite this, she doesn't "like to really be out with the kids" because she will "get anxiety" and she wants to avoid those episodes.  AR 47.

When the ALJ questioned Ms. Scott about her social activities, she answered that she does not have any.  AR 78.  Instead, she "likes[s] to watch TV a lot and listen to music."  AR 50, 78.

With respect to her educational background, Ms. Scott did not graduate from high school.  AR 42.  While in high school, she was enrolled in special education courses such as math and English.  AR 42.

The ALJ then questioned Ms. Scott about her work experience.  Starting in 2001, Ms. Scott worked at the Ye Olde Cookie Company, Inc. ("Ye Old Cookie").  AR 43; AR 238.  Ms. Scott's responsibilities included bagging cookies and making drinks.  AR 43.  She attempted to serve as a cash register.  AR 44.  At times, Ms. Scott "had to stay off from [the] cash register for a little while."  AR 44.  Ms. Scott testified that that she was getting into arguments with customers and customers complained about her.  AR 44.  She explained, "And complaints.  Like, we was – I felt like they was [sic] being rude, and I don't know, I had got complaints and stuff like that."  AR 44.  Ultimately, the company let her go after six or eight months.  AR 44-45.  Ms. Scott testified that she believes the company let her go in part due to these arguments and complaints but also because she "was ready to leave anyway."  AR 44.  When the ALJ asked if this was a mutual parting, she agreed that it was.  AR 44.

After working at the Ye Old Cookie, Ms. Scott worked at Taco Bell for a short period of time.  AR 44.  The ALJ asked why Ms. Scott only worked a short period of time at Taco Bell.  Ms. Scott explained,

> I don't know.  I wasn't ready to work there.  I tried it out, but it wasn't working out for me.  I worked there a little, like two weeks.

United States District Court
Northern District of California

1   The ALJ then turned to Ms. Scott's summer job at the Educational Data Systems.  AR 45.  She

2   successfully completed the job.  AR 45.

3    After the summer position at Educational Data Systems, Ms. Scott worked at McDonald's.  AR

4   46.  When the ALJ asked about her responsibilities at McDonald's, Ms. Scott replied that she did

5   the same type of work as she did at Taco Bell and Ye Old Cookie.  AR 46.  Ms. Scott elaborated

6   that she made drinks and "put the orders together."  AR 46.  Again, the ALJ asked Ms. Scott the

7   reason why her position at McDonald's lasted only a short period of time.  AR 46.  Ms. Scott

8   explained that she quit but she couldn't quite explain the reason for quitting.  AR 46.  She stated,

9   "I don't know, just the whole thing, my reacting I guess.  It just wasn't me at the time."  AR 46.

10      When the ALJ asked if she would be able to work if she did not have to care for her children,

11  she replied that she is not able to work.  AR 53.  Ms. Scott explained,

12

13          Well, it's not – I don't know.  I didn't work really before I had them, and I – I don't
        know, it's just the whole – I don't know, I tried it out, but it just – I don't know, it
        just don't work out for me and I tried.  I tried to do different things, but I don't
14          know.

15  AR 53.  When asked about what she would like to do in the future, Ms. Scott stated that

16  she "would like to be stable, find something that's not too much, just something like just –

17  something easy."  AR 54.

18      The ALJ then inquired about Ms. Scott's medication and treatment.  AR 51.  She testified that

19  she takes Albuterol and Advair for her asthma.  AR 51.  Specifically, she takes Albutertol when

20  she has an asthma attack and Advair to maintain her condition on a daily basis.  AR 51.  Ms. Scott

21  testified that she uses Albuterol about three to six times a week.  AR 51.  When the ALJ asked Ms.

22  Scott if she had been to the emergency room for asthma, she answered that in 2005 she "was

23  treated for asthma and then – and dehydration."  AR 51.

24      The ALJ then asked about Ms. Scott's complaint to her doctor that she "felt that things can

25  read" her thoughts.  AR 53.  She testified that "What I feel – I just feel like I'm just an open book

26  sometimes, all the time."  AR 53-54.  When asked to clarified, she explained that "LIKE people

27  can just read my thoughts like.  A constant – I know how to explain it."  AR 54.

28      Ms. Scott testified that she weeps once a week.  AR 55.  She becomes overwhelmed and

United States District Court
Northern District of California

emotional due to her thoughts, which ranges from fear to happiness.  AR 56.  She testified that "[i]t changes from time to time."  AR 79.  For example, she can "be sad and then be angry."  AR 79.  She's often sad as opposed to angry.  AR 79.  Ms. Scott testified that being around people in the workplace can upset her "to a certain extent."  AR 57.

**E.  ALJ's Findings**

Applying the sequential evaluative process, on January 29, 2010, the ALJ held that Ms. Scott was not disabled under § 1614(a)(3)(A) of the Social Security Act and therefore was not entitled to supplemental security income benefits.  AR 31.

At step one, the ALJ found that Ms. Scott had not engaged in substantial gainful activity since January 22, 2009, the date that Ms. Scott filed for supplemental security income benefits.  AR 24.

At step two, the ALJ found that Ms. Scott suffered from the following severe impairments: depressive disorder with borderline intellectual functioning.  AR 24.

At step three, the ALJ found that Ms. Scott did not suffer from an impairment or combination of impairments that either was listed in the regulations or was medically equivalent to one of the listed impairments.  AR 24-26.

The ALJ then determined Ms. Scott's residual functional capacity ("RFC") in order to assess at steps four and five whether she could perform her past relevant work or any other work considering her age, education, and work experience.  AR 26.  The ALJ found that Ms. Scott had the RFC to perform light work, as defined in 20 C.F.R. 416.967(b) with the following limitations: 1) "mentally limited from understanding, remembering, or carrying out complex or complicated instructions;" and 2) "unable to work with the public or in close interaction with coworkers."  AR 26.

In making this RFC finding, the ALJ considered the symptoms and how consistent they were with the objective medical evidence (based on the requirements of 20 C.F.R. § 416.929 and Social Security Rulings 96-4p and 96-7p).  AR 26.  He also considered opinion evidence under 20 C.F.R. § 416.927 and Social Security Rulings 96-2p, 96-5p, 96-6p, and 06-3p.  AR 26.  The ALJ followed a two-step process, first determining whether there was a medically-determinable physical or mental impairment that reasonably could be expected to produce Ms. Scott's pain and

symptoms, and then evaluating the intensity, persistence, and limiting effects of the symptoms to determine the extent that they limited Ms. Scott's ability to do basic work activities. AR 26. For the second part, whenever Ms. Scott's statements about the intensity or functionally limiting effects of pain or other symptoms were not substantiated by objective medical evidence, the ALJ made findings on the credibility of the statements based on the "entire case record." AR 26.

The ALJ noted that Ms. Scott alleged disability because of asthma, umbilical hernia, and a heart murmur. AR 26. In reviewing the record, the ALJ then discussed Ms. Scott's complaints regarding her asthma. Despite taking her medication, Ms. Scott reported that she had four to five asthma attacks per week. AR 26. Moreover, she was hospitalized on one occasion. AR 26. Ms. Scott further reported that her medical conditions precludes "her from sitting, standing or walking for long periods secondary to dizziness, fatigue, nausea, constipation, pain, and shortness of breath." AR 26. She elaborated that she is only able to walk and sit for a maximum of one hour and walk to a maximum of twenty feet. AR 26. In addition, Ms. Scott's conditions interfered with her daily activities. AR 26. Specifically, she would get dizzy and shortness of breath whenever she went shopping. AR 26.

Next, the ALJ discussed Ms. Scott's complaint of mental problems such as depression and anxiety. AR 27. Ms. Scott reported that her anxiety caused her to have panic attacks that would occasionally result in her losing consciousness. AR. 27. She requires help from others in completing tasks, including grooming and shopping. AR 27. In addition, Ms. Scott's mother reported that Ms. Scott does not respond well to stress and is unable to perform many activities of daily living. AR 27.

After describing Ms. Scott's complaints, the ALJ found that Ms. Scott's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but found that her statements "concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity (RFC) assessment." AR 27.

The ALJ found that Ms. Scott's "allegations of disabling pain and other symptoms were disproportionate to the minimal objective findings, and they were inconsistent with the medical

opinion evidence." (citations omitted).  AR 27.  First, the ALJ opined that "there is no medical

evidence of asthma attacks."  AR 27.  Despite her severe impairments, the ALJ stated that it "does

not appear to interfere with her ability to perform all basic work activities."  AR 27.  Moreover,

Dr. Chen's examination revealed that Ms. Scott did not have asthma-related symptoms.  AR 27.

The ALJ also found that "the evidence did not show increase symptoms or signs, demonstrated by

hospitalizations or significant alteration in medication."  AR 27.  Citing to Dr. Bradus's report and

an asthma questionnaire from Ms. Scott, the ALJ indicated that record contained one mention of a

"hospitalization due to asthma exacerbation but this was not documented."  AR 27.

With respect to Ms. Scott's umbilical hernia, the ALJ found that she did not seek medical

attention of the type that one would expect given her allegations of disabling symptoms and

limitations.  AR 27.  Specifically, the ALJ opined that Dr. Chen indicated that Ms. Scott's hernia

was "reducible, meaning that the contents of the hernia could be returned into the abdominal

cavity, reducing her pain."  AR 27.  Even though medical treatment could have reduced her pain

and improved her condition, "it appeared that she did not followed [sic] up with her doctors

regarding her treatment options, which strongly suggests that her symptoms were not as severe as

alleged."  AR 27.

With respect to Ms. Scott's alleged heart murmur, the ALJ found that her treatment history and

the objective findings did not support her allegations that the condition interfered with ability to

perform basic work activities.  AR 27.  Citing to Drs. Chen's and Rao's reports, the ALJ noted

that Ms. Scott failed to mention the heart murmur impairment in several examinations.  AR 27.

Moreover, the ALJ opined that "the record did not contain diagnostic or objective findings

indicating that her heart murmur was severe enough to preclude her from performing light work

activities."  AR 28.

With respect to Ms. Scott's panic attacks, the ALJ found that the "record did not show that

they could not be controlled with medication."  AR 28.  Moreover, the ALJ opined that the record

showed that Ms. Scott "was able to function between flare-ups, and that exacerbations were due to

factors that would likely not recur, such as a family member's death."  AR 28.  Furthermore, the

ALJ noted that Ms. Scott's treatment were conservative.  AR 28.  Even though she took Prozac to

United States District Court
Northern District of California

manage her symptoms, Ms. Scott did not consider therapy.  AR 28.  Ms. Scott's unwillingness to consider therapy suggest that her "symptoms were not as bothersome as alleged."  AR 28.

Even though Ms. Scott complained of depression, the ALJ opined that she did not seek "treatment on her own until prompted after the first hearing."  AR 30.  Moreover, "Ms. Scott is caring for three young children and testified that she believed she could care for them by herself."  AR 30.

In assessing Ms. Scott's credibility, the ALJ also considered Ms. Scott's work history and daily activities.  AR 28.  The ALJ reasoned that Ms. Scott's work history revealed that she "worked only sporadically prior to [the] alleged onset date, which raises a question as to whether her continuing unemployment was actually due to her medications."  AR 28 (citation omitted).  Prior to the alleged onset date, "[h]er earnings have been minimal and she has never worked at a substantial gainful activity level."  AR 28.  As for Ms. Scott's daily activities, the ALJ noted that Ms. Scott testified that she was able to care for her three children at home.  AR 28.  Moreover, the ALJ noted "how calmly the Claimant testified, even though she was late to her supplemental hearing because there were long lines waiting to get into the federal building, which, one would think would be tension provoking."  AR 28.

After discussing Ms. Scott's credibility, the ALJ described Dr. Chen's report.  AR 28.  In addition to the reducible umbilical hernia and asymptomatic asthma, Dr. Chen mentioned that Ms. Scott was six months pregnant at the time.  AR 28.  With respect to her RFC, Dr. Chen reported that Ms. Scott has the ability to lift and carry twenty pounds occasionally and ten pounds frequently.  AR 28.  In light of Ms. Scott's history of asthma, Dr. Chen indicated that Ms. Scott should avoid environmental exposures to chemicals, dust, and fumes.  AR 28.  The ALJ found that "certain aspect [e.g., a light exertional level] of Dr. Chen's opinion are consistent" with the ALJ's RFC finding.  AR 28.  Despite this consistency, the ALJ determined that "the record as a whole did not support the environmental restrictions."  AR 28.  As such, the ALJ only afforded the opinion "some significant weight."  AR 28.

Next, the ALJ turned to Dr. Rao's opinion.  AR 29.  Dr. Rao noted that Ms. Scott was able to perform daily activities.  AR 29.  Despite this, Dr. Rao concluded that Ms. Scott had a psychotic

United States District Court
Northern District of California

disorder and an anxiety disorder.  AR 29.  Dr. Rao opined that Ms. Scott had the following

limitations: 1) a severe impairment in her ability to understand, remember, and complete complex

instructions; 2) a moderate impairment in her ability to understand, remember, and complete

simple instructions; 3) severe impairment in her ability to interact appropriately with others; and

4) severe difficulty with the usual stresses entered in any competitive work environment.  AR 29.

In addition to these limitations, Dr. Rao found that Ms. Scott was unable to perform activities on a

consistent basis.  After describing Dr. Rao's opinion, the ALJ found that Dr. Rao's opinion was

inconsistent with the record as a whole and underestimated Ms. Scott's RFC.  As such, the ALJ

afforded the opinion little weight.  AR 29.

The ALJ then described Dr. Spivery's opinion.  AR 29.  The ALJ described Ms. Scott's

complaint to Dr. Spivery but found that the "examination, however, was, essentially, normal."  AR

29.  Dr. Spivery reported "that there was no evidence of poor reality testing or thought

disturbance."  AR 29.  Ms. Scott's IQ score demonstrated that she was borderline intellectual

functioning.  AR 29.

Next, the ALJ described the opinion of Ms. Bailey, the psychology trainee.  AR 29.  Ms.

Bailey saw Ms. Scott on three occasions and "noted psychomotor agitations, fleeting eye contact

and nervous laughter."  AR 29.  Moreover, Ms. Bailey opined that Ms. Scott had "depression,

anxiety, and psychotic symptoms, such as paranoia auditory hallucinations, visual hallucinations,

and intrusive ideation."  AR 29.  Despite this, the ALJ concluded that he provides Ms. Bailey's

opinion with little weight, because she is "not an acceptable medical source as defined in 20 CFR

416.913 (a)."  AR 29.  Under the Code of Federal Regulations, the ALJ reasoned that Ms. Bailey's

opinion is not entitled to controlling or significant weight.  AR 29 (citation omitted).  AR 29.

Even though the Social Security Rulings provide that Ms. Bailey's opinion may be entitled to

some weight, the ALJ finds that "Ms. Bailey's opinion is inconsistent with the record as a whole."

AR 29.

With respect to the Third Party Function report, the ALJ also afforded it little weight, because

he found it inconsistent with Ms. Scott's statements and the record as a whole.  AR 30 (citation

omitted).  The ALJ afforded the Disability Determination Service's RFC conclusions with

significant weight because the "record as a whole supported them."  AR 30 (citation omitted).

Having determined Ms. Scott's RFC as allowing for light work that does not require her to work with the public or have close interaction with coworkers and a limitation in understanding, remember, or carrying out complex or complicated instructions, the ALJ proceeded with steps four and five of the sequential evaluative process.  AR 26-30.

At step four, the ALJ found that Ms. Scott had no past relevant work.  AR 30.

At step five, the ALJ noted that Ms. Scott was a "younger individual" pursuant to 20 C.F.R. § 404.1563 and that Ms. Scott has a limited education and is able to communicate in English.  AR 30.  In considering Ms. Scott's RFC, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2, the ALJ determined that Ms. Scott had the RFC to perform the full range of light work but "it has been impeded by additional limitations."  AR 30-31.  The ALJ stated that he asked the VE as to "whether jobs exist in the national economy for an individual with the Claimant's age, education, work experience, and residual functional capacity."  AR 35.  In response, the VE testified that Ms. Scott "would be able to perform the requirements of representative sedentary and light unskilled occupations such as laundry worker (302.685-010), hand packager/inspector (559.687-074), and final assembler (713.687-018)."  AR 35.  All of these occupations exist in significant numbers in the national and local economies.  AR 35.  The VE's testimony is consistent with the information contained in the DOT.  AR 35.

The ALJ thus concluded that Ms. Scott was not disabled as defined in the Social Security Act from January 22, 2009 to the date of the ALJ's decision.  AR 36.

## ANALYSIS

Ms. Scott challenges the ALJ's decision on five grounds: 1) the ALJ failed to include psychotic disorder, anxiety disorder, and asthma as severe impairments; 2) the ALJ improperly disregarded the treating source's opinion; 3) the ALJ did not give the examining psychologist's opinion adequate weight; 4) the ALJ improperly discredited Ms. Scott's testimony; and 5) in light of the improperly disregarded or discredited evidence, the RFC and hypothetical did not adequately describe her limitations.  Pl.'s Mot., ECF No. 17.

United States District Court
Northern District of California

CV 12-1835
ORDER

17

1 | **I. LEGAL STANDARD**

2 |     **A. Standard of Review**

3 |     Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the

4 | Commissioner if the plaintiff initiates the suit within 60 days of the decision. District courts may

5 | set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error

6 | or are not supported by substantial evidence in the record as a whole." 42 U.S.C. § 405(g);

7 | *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quotation omitted). "Substantial evidence

8 | means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a

9 | reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d

10 | 1035, 1039 (9th Cir. 1995). If the evidence in the administrative record supports both the ALJ's

11 | decision and a different outcome, the court must defer to the ALJ's decision and may not

12 | substitute its own decision. *See id.*; *accord Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir.

13 | 1999).

14 |     **B. Applicable Law: Five Steps to Determine Disability**

15 |     An SSI claimant is considered disabled if (1) he suffers from a "medically determinable

16 | physical or mental impairment which can be expected to result in death or which has lasted or can

17 | be expected to last for a continuous period of not less than twelve months," and (2) the

18 | "impairment or impairments are of such severity that he is not only unable to do his previous work

19 | but cannot, considering his age, education, and work experience, engage in any other kind of

20 | substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(A) &

21 | (B).

22 |     The Social Security regulations set out a five-step sequential process for determining whether

23 | a claimant is disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 404.1520.

24 | The five steps are as follows:

25 |         **Step One.** Is the claimant presently working in a substantially gainful activity? If so,

26 |         then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not

27 |         working in a substantially gainful activity, then the claimant's case cannot be resolved at

28 |         step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

*United States District Court*
*Northern District of California*

CV 12-1835
ORDER

1   **Step Two.**  Is the claimant's impairment (or combination of impairments) severe?  If not,

2   the claimant is not disabled.  If so, the evaluation proceeds to step three.  *See* 20 C.F.R. §

3   404.1520(a)(4)(ii).

4   **Step Three.**  Does the impairment "meet or equal" one of a list of specified impairments

5   described in the regulations?  If so, the claimant is disabled and is entitled to benefits.  If

6   the claimant's impairment does not meet or equal one of the impairments listed in the

7   regulations, then the case cannot be resolved at step three, and the evaluation proceeds to

8   step four.  *See* 20 C.F.R. § 404.1520(a)(4)(iii).

9   **Step Four.**  Considering the claimant's residual functional capacity, is the claimant able

10   to do any work that he or she has done in the past?  If so, then the claimant is not

11   disabled and is not entitled to benefits.  If the claimant cannot do any work he or she did

12   in the past, then the case cannot be resolved at step four, and the case proceeds to the

13   fifth and final step.  *See* 20 C.F.R. § 404.1520(a)(4)(iv).

14   **Step Five.**  Considering the claimant's residual functional capacity, age, education, and

15   work experience, is the claimant able to "make an adjustment to other work?"  If not,

16   then the claimant is disabled and entitled to benefits.  *See* 20 C.F.R. § 404.1520(a)(4)(v).

17   If the claimant is able to do other work, the Commissioner must establish that there are a

18   significant number of jobs in the national economy that the claimant can do.  There are

19   two ways for the Commissioner to show other jobs in significant numbers in the national

20   economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-

21   Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.  If the Commissioner

22   meets this burden, the claimant is not disabled.

23   For steps one through four, the burden of proof is on the claimant.  At step five, the burden

24   shifts to the Commissioner.  *See* Tackett, 180 F.3d at 1098.

25   **II. APPLICATION**

26   **A. Step Two: Severe Impairments**

27   Ms. Scott contends that the ALJ failed to include psychotic disorder, anxiety disorder, and

28   asthma in the ALJ's list of Ms. Scott's severe impairments.  Pl.'s Mot., ECF No. 17 at 10.  In

United States District Court
Northern District of California

support of her argument, Ms. Scott points to her own subjective complaints, *see* AR 263-267, and

medical record from NAHC, PSC, and Dr. Rao. *Id.* With respect to Ms. Scott's asthma, the ALJ

stated:

> The records reflect complaints of asthma. The Claimant's asthma seems to be non-
> severe, individually, and in combination with the other impairments. There is no
> current evidence of exacerbations or significant sensitivity to dust, fumes, or
> smoke. A consultative examiner, Frank, M.D., concluded that the Claimant was
> asymptomatic. A pulmonary study was normal. AR 24.

With respect to the psychotic and anxiety disorder, the ALJ did not discuss it in step two. The

Commissioner offers several reasons why Ms. Scott's alleged psychotic and anxiety disorder are

not severe impairments, but the court cannot offer post-hoc rationalizations. *See SEC v. Chenery*,

332 U.S. 194, 196 (1995). Nevertheless, even though the ALJ did not discuss the psychotic and

anxiety disorder, the court finds that this is a harmless error, because step two was "resolved in her

favor." *See Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005) (holding that the ALJ

committed a harmless error in failing to consider claimant's obesity under step two because that

step was still "resolved in her favor"). Moreover, the ALJ discussed Ms. Scott's anxiety and

psychotic disorder and its related symptoms at step four. Therefore, the court finds that it is not

appropriate to remand solely for this reason.

### B. Treating Physician's Opinion[3]

Next, Ms. Scott contends that the ALJ erred by rejecting the opinion of treating physician Dr.

Eichelberger without clear and convincing or specific and legitimate explanation. Pl's Mot., ECF

No. 17 at 11-12. When determining whether a claimant is disabled, the ALJ must consider each

medical opinion in the record together with the rest of the relevant evidence. 20 C.F.R. §

416.927(b); *Zamora v. Astrue*, No. C 09-3273 JF, 2010 WL 3814179, at *3 (N.D. Cal. Sept. 27,

2010). "By rule, the Social Security Administration favors the opinion of a treating physician over

---

[3] Ms. Scott contends that the medical records from the NAHC were created by Dr. Eichelberger.
The signatures from the NAHC record are illegible. Nevertheless, the parties do not dispute the
information contained in the NAHC record was prepared by Dr. Eichelberger. *See generally* Pl.'s
Mot., ECF No. 17; Comm'r's Opp'n and Cross-mot., ECF No. 21.

United States District Court
Northern District of California

non-treating physicians." *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. §

404.1527). "The opinion of a treating physician is given deference because 'he is employed to

cure and has a greater opportunity to know and observe the patient as an individual.'" *Morgan v.

Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (citing *Sprague v. Bowen*, 812

F.2d 1226, 1230 (9th Cir. 1987)). "However, the opinion of the treating physician is not

necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Id.*

(citing *Magallanes*, 881 F.2d at 751 and *Rodriguez v. Bowen*, 876 F.2d 759, 761-62 & n.7 (9th

Cir. 1989)).

   "If a treating physician's opinion is 'well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the]

case record, [it will be given] controlling weight.'" *Orn*, 495 F.3d at 631(quoting 20 C.F.R. §

404.1527(d)(2)). "If a treating physician's opinion is not given 'controlling weight' because it is

not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the

[Social Security] Administration considers specified factors in determining the weight it will be

given." *Id.* "Those factors include the '[l]ength of the treatment relationship and the frequency of

examination' by the treating physician; and the 'nature and extent of the treatment relationship'

between the patient and the treating physician." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)(i)-(ii)).

"Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the

treating physician, include the amount of relevant evidence that supports the opinion and the

quality of the explanation provided; the consistency of the medical opinion with the record as a

whole; the specialty of the physician providing the opinion; and '[o]ther factors' such as the

degree of understanding a physician has of the [Social Security] Administration's 'disability

programs and their evidentiary requirements' and the degree of his or her familiarity with other

information in the case record." *Id.* (citing 20 C.F.R. § 404.1527(d)(3)-(6)). Nonetheless, even if

the treating physician's opinion is not entitled to controlling weight, it is still entitled to deference.

*See id.* at 632 (citing SSR 96-02p at 4 (Cum. Ed. 1996)). Indeed, "[i]n many cases, a treating

source's medical opinion will be entitled to the greatest weight and should be adopted, even if it

does not meet the test for controlling weight." SSR 96-02p at 4 (Cum. Ed. 1996).

"Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians." *Orn*, 495 F.3d at 631 (citing 20 C.F.R. § 404.1527(d)(1)-(2)); *see also* 20 C.F.R. § 404.1527(d). Accordingly, "[i]n conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). "'To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence.'" *Id.* (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (citing *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995)). "'If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.'" *Id.* (quoting *Bayliss*, 427 F.3d at 1216).[1] Opinions of non-examining doctors alone cannot provide substantial evidence to justify rejecting either a treating or examining physician's opinion. *See Morgan*, 169 F.3d at 602. An ALJ may rely partially on the statements of non-examining doctors to the extent that independent evidence in the record supports those statements. *Id.* Moreover, the

---

[1] Although the type of reasons needed to reject either a treating or an examining physician's opinion is the same, the amount and quality of evidence in support of those reasons may be different. As the Ninth Circuit explained in *Lester*:

> Of course, the type of evidence and reasons that would justify rejection of an examining physician's opinion might not justify rejection of a treating physician's opinion. While our cases apply the same legal standard in determining whether the Commissioner properly rejected the opinion of examining and treating doctors— neither may be rejected without 'specific and legitimate' reasons supported by substantial evidence in the record, and the uncontradicted opinion of either may only be rejected for 'clear and convincing' reasons—we have also recognized that the opinions of treating physicians are entitled to greater deference than those of examining physicians. *Andrews*, 53 F.3d at 1040-41; *see also* 20 C.F.R. § 404.1527(d). Thus, reasons that may be sufficient to justify the rejection of an examining physician's opinion would not necessarily be sufficient to reject a treating physician's opinion. Moreover, medical evidence that would warrant rejection of an examining physician's opinion might not be substantial enough to justify rejection of a treating physician's opinion.

*Lester*, 81 F.3d at 831 n.8.

United States District Court
Northern District of California

1    "weight afforded a non-examining physician's testimony depends 'on the degree to which they

2    provide supporting explanations for their opinions.'"  *See Ryan*, 528 F.3d at 1201 (quoting 20

3    C.F.R. § 404.1527(d)(3)).

4        As Ms. Scott contends, even though the ALJ considered Dr. Eichelberger's opinion with

5    respect to her credibility assessment, he did not consider it for its medical opinion.  In relevant

6    part, the ALJ stated,

> 7    In terms of the Claimant's panic attacks, the record did not show that they could
> 8    not be controlled with medication.  In fact, the record reflected that she was able to
>      function between flare-ups, and that her exacerbations were due to factors that
> 9    would most likely not recur, such as a family member's death.  (Exhibit 16F).
>      Further, the treatment she received was conservative in nature.  Although she took
> 10   Prozac to manage her symptoms, it was noted that she was not willing to consider
>      therapy, which tends to suggest that her symptoms were not as bothersome as
> 11   alleged.  (See Exhibit 9F).[4]

12       Here, the ALJ mentioned the medical records from Dr. Eichelberger of NAHC to discredit Ms.

13   Scott but did not provide any analysis as to the weight given to the opinion.  *See* SSR 96-2P

14   (explaining that a treating source opinion, even if inconsistent with other substantial evidence in

15   the record, must be afforded deference and weighed using all the factors listed under 20 C.F.R. §

16   404.1527).  For instance, in the record, Dr. Eichelberger stated "A/P: anxiety or depression."  AR

17   432.  This statement regarding Ms. Scott's anxiety is not inconsequential to the anxiety disorder

18   that she alleged.  *See Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006).

19   Therefore, the court cannot say that this is a harmless error and finds that remand is appropriate to

20   allow the ALJ to conduct a proper inquiry into Dr. Eichelberger's opinion.  *See Molina*, 674 F.3d

21   at 1122.

22       **C.  Examining Psychologist's Opinion**

23       Ms. Scott also argues that the ALJ improperly rejected the opinion of a consultative examiner,

24   Dr. Rao, and gave greater weight to another examining physician and non-examining physician

25   without providing specific and legitimate reasons.  Pl.'s Mot., ECF No. 17 at 12-16.  In support of

26

27   _____

28   [4]  The exhibits mentioned refer to the medical records from NAHC.

1    her contention, Ms. Scott points to Dr. Eichelberger's opinion, Anna Bailey, and Dr. Tisdell.  *Id.*

2    at 13.  The ALJ provided little weight to Dr. Rao's opinion because it "was inconsistent with the

3    record as a whole, and was an underestimate of the Claimant's residual functional capacity."  AR

4    29.

5          The ALJ rejected the letter dated May 12, 2011 and signed by Ms. Bailey and Dr. Tisdell from

6    PSC, because 1) Ms. Bailey, a psychology trainee, is not an acceptable medical source and 2) her

7    "opinion is inconsistent with the record as a whole."  AR 29; *Moreland v. Barnhart*, C 00-01420

8    MMC, 2002 WL 654095 (N.D. Cal. Apr. 16, 2002) *aff'd,* 76 F. App'x 818 (9th Cir. 2003) (finding

9    that psychological interns are not an acceptable medical source under the Code of Federal

10   Regulations).  Even though Ms. Bailey is not an acceptable medical source, Dr. Tisdell cosigned

11   the letter and is an acceptable medical source if he took part in the treatment, making him a

12   treating source.  It is not clear from the record or the ALJ's decision as to Dr. Tisdell's

13   involvement in Ms. Scott's care.  Even though Ms. Scott did not explicitly raise this issue, the

14   court finds that it is appropriate to remand so that the ALJ can determine whether the opinion

15   described in the letter is an opinion of an acceptable medical source and therefore, a treating

16   source that is presumably given controlling weight.

17         On remand, the ALJ will be able to consider this opinion in light of Dr. Eichelberger's

18   opinion.  The ALJ's crediting of the evidence and opinion may change based on its determination

19   of Dr. Eichelberger's opinion.

20         The ALJ did not provide specific and legitimate reasons for rejecting Dr. Rao's opinion but

21   gave only conclusory statements.  Here, as the Commissioner contends, the record contains

22   reasons to discount Dr. Rao's opinion.  Comm'r's Opp'n and Cross-mot., ECF No. 21 at 15-17

23   (arguing that Dr. Rao's opinion contained inconsistent findings, contradicted Dr. Spivery's

24   opinion, and was found to be unsupported by the record according to Dr. Norbeck).  Nevertheless,

25   the court cannot provide post-hoc rationalizations for the ALJ's decision.  *See SEC v. Chenery*

26   *Corp.*, 332 U.S. 194, 196 (1947).  Therefore remand to the agency with instructions to conduct a

27   proper inquiry into Dr. Rao's and Dr. Tisdell's opinions is appropriate.

28

**D.  Credibility Determination**

Ms. Scott contends that the ALJ's finding that she was "less than fully credible" is not supported by specific, clear, and convincing reasons.  Pl.'s Mot., ECF No. 17 at 16-18.  The court disagrees because the ALJ provided several reasons for finding that Ms. Scott was not fully credible.  AR

To determine whether a claimant's testimony about subjective pain or symptoms is credible, the ALJ must engage in a two-step analysis.  *See Vasquez*, 572 F.3d at 591 (citing *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)).  First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that reasonably could be expected to produce the alleged pain or other symptoms.  *See Lingenfelter*, 504 F.3d at 1036.  Second, if the claimant meets the first test and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of his symptoms only by offering specific, clear, and convincing reasons for doing so.  *Id.*  When the ALJ finds a claimant's testimony not reliable, the ALJ must "specifically identify what testimony is credible and what testimony undermines the claimant's complaints."  *Morgan*, 169 F.3d at 499.  This court defers to the ALJ's credibility determination if it is supported by substantial evidence in the record.  *See Thomas*, 278 F.3d at 959.

Here, the ALJ satisfied the first prong because it found that Ms. Scott's impairments could reasonably cause the alleged symptoms.  *See AR 27.*  Under the second prong, the ALJ did not state that Ms. Scott was malingering and found that Ms. Scott's statements about the "intensity, persistence, and limiting effect of her symptoms" were not credible to the extent that they were inconsistent with his determination of the RFC.  *See AR 27.*  Because the ALJ did not find that Ms. Scott was malingering, he may only reject the claimant's testimony of her symptoms by offering specific, clear, and convincing reasons.

Ms. Scott contends that the ALJ failed to provide specific, clear, and convincing reasons for finding that she was not fully credible.  Pl.'s Mot., ECF No. 17 at 17.  In his decision, the ALJ explained that Ms. Scott's symptoms from her asthma, umbilical hernia, heart murmur, and panic attacks did not appear to be as disabling as she alleged.  AR 27-28.  With respect to Ms. Scott's

asthma symptoms, the ALJ explained why the alleged symptoms were not credible.  AR 27.  In

relevant part, the ALJ stated:

> Even though she alleged that her asthma was uncontrolled and that she had frequent
> flare-ups, the record revealed that medication has been successful in controlling her
> symptoms.  A consultative examiner noted that she had no asthma related
> symptoms, and the evidence did not show increased symptoms or signs,
> demonstrated by hospitalizations or signification alteration in medication.  The
> record referred to one hospitalization due to asthma exacerbation, but this was not
> documented.

AR 27 (citations omitted).

The ALJ then turned to Ms. Scott's alleged disability from an umbilical hernia.  AR 27.  The

medical evidence made several references that the umbilical hernia is reducible.  AR 27.  The ALJ

explained that Ms. Scott's symptom with respect to the hernia is not credible because she did not

seek the type of medical treatment that one would expect given the pain complained.  AR 27.

Ms. Scott argues that the ALJ's finding regarding her work history is "bizarre and confusion,

not clear and convincing, given that she reported a history of depression and suicide attempts as a

teenager, was in her twenties during the relevant period with minor children and living with her

mother."  Reply, ECF No. 24 at 8-9.  The ALJ explained that Ms. Scott's work history further

demonstrated that she is not fully credible.  AR 28.  In explaining the credibility determination, the

ALJ found that Ms. Scott worked "only sporadically prior to the alleged onset date, which raises a

question as to whether her continuing unemployment was actually due to her medical conditions."

AR 28.  The ALJ elaborated that Ms. Scott's earnings "have been minimal and she has never

worked at a substantial gainful activity level."  AR 28.  At the hearing, Ms. Scott testified that she

is not able to work and explained that she "tried it out, but it just . . . don't [sic] work out for" her.

AR 53.  A claimant's work poor work history may be considered as a factor in determining

credibility.  *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (holding that the ALJ properly

discredited the claimant's history based on several factors, including an "extremely poor work

history" and "has shown little propensity to work in her lifetime").

The ALJ also explained that Ms. Scott's treatment was conservative in nature.  AR 28.  Citing

to the medical record from the NAHC, the ALJ explained that Ms. Scott "was not willing to

CV 12-1835
ORDER                                    26

1   consider therapy, which tends to suggest that her symptoms were not as bothersome as she

2   alleged." AR 28. Ms. Scott's conservative treatment is another factor that the ALJ may consider

3   in finding that she was not credible. *See Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007)

4   ("evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding

5   severity of an impairment") (citing to *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995)).

6        Ms. Scott contends that her daily activities do not undermine her credibility. Reply, ECF No.

7   24 at 9. With respect to daily activities, the ALJ reasoned that Ms. Scott "testified that she was

8   able to care for three young children at home, which is quite demanding both physically and

9   emotionally." AR 28. On two separate occasions, Ms. Scott testified that she believes that she

10  can care for her children without her mother's help. *See* AR 78 (testifying affirmatively to the

11  ALJ's question that she could care for children by herself). Even when she feels sad, Ms. Scott

12  testified she is still able to care for her children. AR 80. Although the record on Ms. Scott's daily

13  activities may also lend an interpretation more favorable to Ms. Scott, the ALJ's interpretation was

14  rational and therefore, this court "must uphold the ALJ's decision where the evidence is

15  susceptible to more than one rational interpretation." *Burch*, 400 F.3d at 680-81.

16       Lastly, Ms. Scott contends that the ALJ improperly discredited her testimony on the basis that

17  she calmly testified during the hearing. Pl.'s Mot., ECF No. 17 at 18. Specifically, she offered an

18  alternative explanation for her calm testimony, stating that the record suggests that her calmness

19  during the hearing "was the result of fear and confusion rather than normality." *Id.* The court

20  cannot say that the ALJ erred in its determination.

21       As described above, the ALJ offered several explanations for discrediting Ms. Scott's

22  testimony. Therefore, the court finds that the ALJ properly found that Ms. Scott's testimony was

23  not fully credible.

24  **E.  RFC and Hypothetical**

25       Ms. Scott also contends that the ALJ erred in relying on an RFC that was not supported by

26  substantial evidence and posed hypothetical questions that did not accurately reflect Ms. Scott's

27  non-exertional limitations. Pl.'s Mot., ECF No. 17 at 18-21. Specifically, Ms. Scott argues that

28  had her testimony and Drs. Rao's and Eichelberger's opinions been given proper credit "the RFC

United States District Court
Northern District of California

would have included the following limitations: 1) moderation limitation in ability to understand, remember, and complete simple instructions; 2) severe impairment in ability to understand, remember, and complete complex instructions; 3) severe impairment in the ability to interact appropriately with supervisors, co-workers, and the public; and 4) an inability to perform work activities on a consistent basis. *Id.* at 19. Because the ALJ's RFC did not properly account for all of Ms. Scott's limitations, Ms. Scott also argues that the hypothetical, which was based on the RFC, was also incorrect. *Id.* at 19-20. In light of the court's holding to remand and allow the ALJ to conduct a proper inquiry into Drs. Rao and Eichelberger's opinion, the ALJ is free to reconsider the RFC and hypothetical.

## III. REMAND FOR CONSIDERATION

It is within the court's discretion to remand a case either for further administrative proceedings or for an award of benefits. *See McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989). Here, the record is not developed fully, and the court thus remands to the ALJ.

### CONCLUSION

For the foregoing reasons, the court **GRANTS IN PART** Ms. Scott's motion and **DENIES** the Commissioner's motion. The matter is remanded for further proceedings consistent with this order.

This disposes of ECF Nos. 17 and 21.

**IT IS SO ORDERED**.

Dated: June 22, 2013

_____
LAUREL BEELER
United States Magistrate Judge

United States District Court
Northern District of California